**Paul GALLANT, Wrebbit Toys and Games Mfrs. Inc. and 2798140 Canada, Inc., Plaintiffs,**

v.

**TELEBRANDS CORP., Telebrands Advertising Corp. and R.R. Donnelley & Sons Co., Defendants.**

No. Civ.A. 94–452(AJL).

United States District Court, D. New Jersey.

Dec. 22, 1998.

Robert M. Goodman, C. Brian Kornbrek, Carpenter, Bennett & Morrissey, Newark, NJ, Marshall A. Bennett, Jr., Timothy R. Krogh, Marshall & Melhorn, Toledo, OH, for plaintiffs.

Peter D. Murray, Noram H. Zivin, Wendy E. Miller, Cooper & Dunham LLP, New York City, for Telebrands Corp., Telebrands Advertising Corp. and R.R. Donnelley & Sons Co.

Neil S. Cartusciello, Shanley & Fisher, Morristown, NJ, for Telebrands Corp., Tel-

ebrands Advertising Corp. and R.R. Donnelley & Sons Co.

## OPINION

LECHNER, District Judge.

This case involves a dispute over three dimensional puzzles. Plaintiffs Paul Gallant ("Gallant"), Wrebbit, Inc. (formerly Wrebbit Toys and Games Manufactures, Inc.) ("Wrebbit") and 2798140 Canada Inc. ("Canada Inc.") (collectively, the "Plaintiffs"), filed suit against the defendants Telebrands Corp., Telebrands Advertising Corp., and R.R. Donnelley & Sons Co. ("R.R.Donnelley") (collectively referred to as "Telebrands"), alleging, *inter alia,* violations of the Lanham Act, 15 U.S.C. § 1125(a), unfair competition and patent infringement in violation of 35 U.S.C. §§ 271, 281, 283, 284 and 285, and state law violations concerning unfair trade practices, N.J.S.A. § 56:8–1 *et seq.*

Currently pending is a motion to vacate (the "Motion to Vacate") an order and opinion of United States District Judge John W. Bissell ("Judge Bissell"), dated 4 March 1996 (the "4 March 1996 Order and Opinion"). The 4 March 1996 Order and Opinion granted partial summary judgment to the Plaintiffs on the ground that a three-dimensional puzzle sold by Telebrands, specifically, the "Telebrands Castle Puzzle," infringed upon United States Patent No. 5,251,900 (the "'900 Patent"), issued to Gallant on 12 October 1993.[1] Included in the Motion to Vacate is a request of Telebrands for an independent hearing to construe the patent claims for trial, in accordance with the principles set forth in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) (the "*Markman* Hearing"). Also included in the Motion to Vacate is a request by Telebrands for attorneys' fees as a sanction for discovery violations of the Plaintiffs.[2]

For the reasons set forth below, the Motion to Vacate is granted; the request for a *Markman* Hearing is granted; the request for sanctions is granted.

*Background*

1. The 4 March 1996 Order and Opinion also granted in part a cross-motion by Telebrands for partial summary judgment "in that [Telebrands'] White House puzzle does not infringe the '900 [P]atent." *See* 4 March 1996 Order and Opinion at 13. This aspect of the 4 March 1996 Order and Opinion is not the subject of the Motion to Vacate, nor is it presently contested by the Plaintiffs. As such, the specific finding that the "Telebrands White House Puzzle" does not infringe upon the '900 Patent is not disturbed. The instant motion concerns only the Telebrands Castle Puzzle.

2. In support of the Motion to Vacate, Telebrands submitted:

(1) Memorandum in Support of Defendants' Motion Under Rule 54(b), F.R.Civ.P., for an Order Vacating the March 4, 1996 Partial Summary Judgment Order and Scheduling a *Markman* Hearing on Claim Construction (the "Moving Brief");
(2) Reply Memorandum in Support of Defendants' Motion Under Rule 54(b), F.R.Civ.P., for an Order Vacating the March 4, 1996 Partial Summary Judgment Order and Scheduling a *Markman* Hearing on Claim Construction (the "Telebrands Reply Brief");
(3) Substitute Statement of Indisputable Facts Under Local Civil Rule 56.1 (the "Telebrands Statement of Facts");
(4) Declaration of Wendy E. Miller in Support of Defendants' Motion Under Rule 54(b), F.R.Civ.P., for an Order Vacating the March 4, 1996 Partial Summary Judgment Order, attaching Exhibits One through Twelve (the "Miller Declaration");
(5) Supplemental Declaration of Wendy E. Miller in Support of Defendants' Motion to Vacate Summary Judgment, attaching Exhibits Thirteen through Seventeen (the "Supplemental Miller Declaration"); and
(6) Letter, dated 14 August 1998 (the "Telebrands 14 August 1998 Letter"), attaching excerpts of deposition testimony of Francois Martineau (the "Martineau Deposition").

In opposition to the Motion to Vacate, the Plaintiffs submitted:

(1) Plaintiffs' Memorandum in Opposition to Defendants' Motion Under Rule 54(b), F.R.Civ.P., for an Order Vacating the March 4, 1996 Partial Summary Judgment Order and Scheduling a *Markman* Hearing on Claim Construction (the "Opposition Brief");
(2) Plaintiffs [sic] Response to Defendants' Substitute Supplemental Statement of Indisputable Facts Under Local Civil Rule 56.1 (the "Plaintiffs' Statement of Facts");
(3) Declaration of Marshall A. Bennett, Jr., in Opposition to Defendant's Motion to Vacate;
(4) Appendix to Plaintiffs' Response to Defendants' Rule 54(b) Motion, Volumes One through Four (the "Plaintiffs' Appendix"); and
(5) Letter, dated 21 August 1998, in opposition to the submission of the Martineau Deposition (the "Plaintiffs' 21 August 1998 Letter").

## A. *Facts*[3]

### 1. *The Parties*

Wrebbit and Canada Inc. are Canadian companies which manufacture and sell three dimensional puzzles. Gallant, a Canadian businessman, possesses an ownership interest and management control in both Wrebbit and Canada Inc.

As mentioned, on 12 October 1993, Gallant was issued the '900 Patent for a "Three–Dimensional Puzzle Structure" (the "Invention"). The '900 Patent was assigned to Wrebbit and Canada, Inc., as the sole licensees for the manufacture and sale of three dimensional puzzles utilizing the patented structure. Wrebbit has manufactured and sold more than forty-five different three dimensional puzzles, including castle models, under the trademark "PUZZ–3D" (the "Wrebbit Puzzles").

In or about 1992, the Plaintiffs entered into an agreement (the "1992 Agreement") with Pierre Benoit ("Benoit"), a Canadian businessman, and certain companies, Distributions Muralex, Inc. ("Muralex"), Canovex Inc. ("Canovex") and 133064 Canada Inc., d/b/a Supertek International TV–Products ("133064 Canada Inc.") (collectively, the "Benoit Companies"). Pursuant to the 1992 Agreement, the Benoit Companies distributed the Wrebbit Puzzles from 1992 to 1994.

In May 1993, Benoit and Muralex entered into an independent agreement with Telebrands to produce and market three dimensional puzzles (the "1993 Agreement"). In February 1994, upon learning of the 1993 Agreement, Wrebbit terminated its relationship with Benoit. Pursuant to the 1993 Agreement, Telebrands, through Benoit, marketed and sold the Telebrands Castle Puzzle in 1994 and 1995. The Telebrands Castle Puzzle was manufactured for Telebrands by R.R. Donnelley.

### 2. *The '900 Patent*

Gallant filed a patent application in the United States on 22 June 1992 (the "U.S. Patent Application"). The U.S. Patent Application was modeled after a Canadian patent application Gallant previously filed on 9 September 1991 (the "Canadian Patent Application"). The initial claims and specification of the '900 Patent were drafted on behalf of Gallant by patent agent, Francois Martineau ("Martineau"). The '900 Patent summarized the Invention as follows:

Accordingly with the objects of the invention, there is disclosed a modular unit for use in a three-dimensional, self-standing, continuous puzzle structure, consisting of a planar, polygonal block defining first and second, opposite, main, flat faces, and a peripheral edge joining said first and second faces orthogonally relative thereto, at least one of said first and second faces forming an image destined to face externally of said puzzle structure; said block edge comprising: (a) first, dovetail joint means, for releasably anchoring complementary dovetail joint means of a second block edgewisely of the first-mentioned block within the plane of the second block; and (b) second, straight tenon and mortise joint means, for frictionally securing complementary tenon and mortise joint means of a third block edgewisely of the first-mentioned block within a plane substantially orthogonal to the third block; wherein said second joint means is characterized in that it specifically allows assemblage of a number of walls each made from a plurality of said modular units, and erection of a puzzle structure having a continuous external surface circumscribing an enclosure.

Preferably, third, straight tenon and mortise joint means are provided, for frictionally securing a pair of complementary tenon and mortise joint means from fourth and fifth blocks edgewisely of the first-mentioned block, the fourth block being orthogonal to the first block and the fifth block being orthogonal to both the first-mentioned block and the fourth block; wherein an image is formed on both said first and second faces of the first mentioned block. . . .

---

**3.** The facts relevant to the instant motion are derived mainly from the Telebrands Statement of Facts and the Plaintiffs' Statement of Facts. Where necessary, additional facts are gleaned from prior or contemporaneous submissions of the parties.

Alternately, the invention also consists of the combination of a number of first and second modular units releasably interlocked with one another to form a three dimensional, continuous puzzle, each modular unit consisting of a planar, polygonal block defining first and second, opposite, main, flat faces, and a peripheral edge joining said first and second faces orthogonally relative thereto, at least one of said first and second faces of each block forming a small image which, combined with the images from corresponding faces of the other said blocks, form a continuous main image; each said block edge from each one of said first and second modular units comprising: (a) first dovetail joint means, releasably anchoring complementary joint means from a second said block edgewisely of the first mentioned block within the plane of the latter block; and each said block edge from each one of said second modular units further comprising: (b) second, straight tenon and mortise joint means, frictionally securing complementary joint means from a third block edgewisely of the first mentioned block within a plane substantially orthogonal to the latter block; wherein said second joint means is characterized in that it specifically allows assemblage of a number of walls each made of a plurality of said modular units, and erection of a puzzle structure having a continuous external surface circumscribing an enclosure.

Preferably then, in its assembled state, said puzzle forms a building structure defining a horizontal bottom base wall and vertical side walls interlocked with and edgewisely projecting from said base wall, the said enclosure being defined between said vertical side walls; and further including a large, cardboard-based roofing sheet, installed over the top edge defined by said vertical side walls, and means are provided for self-support of said roofing sheet thereon.

'900 Patent at col. two, line 25 to col. three, line 29.[4] A section entitled "Detailed Description of the Invention" described the "in-

novative features" of the Invention. It stated, in relevant part:

> The innovative features lie in the corner joints ... where the straight (U–Shape) mortise and tenon parts ... intervene to join two building blocks about two planes transverse to each other. Since the corner joints ... interlock modular units ... about transverse, preferably orthogonal planes, there is always a vertical wall edgewisely sitting against a substantially horizontal wall. This biases the straight mortise and tenon joint in interlocking state, under the bias of the vertical wall weight. . . .

> It is understood that such straight joints ... will enable erecting a building with it upright walls defining a continuous enclosure, i.e. that the lateral upright walls of the building can be interlocked in a continuous fashion around a closed inner chamber. In other words, straight joints ... will allow installation of all of the side walls, including the last side wall which closes the enclosures.

*Id.* at col. four, line 64 to col. five, line 22.

The first claim of the '900 Patent ("Claim One") set forth the basic structure covered by the patent:

> A modular unit for use in a three dimensional, self-standing, continuous puzzle structure, consisting of a planar, polygonal block defining first and second, opposite, main, flat faces, and a peripheral edge joining said first and second faces orthogonally relative thereto, at least one of said first and second faces forming an image destined to face externally of said puzzle structure; said block edge comprising:

> (a) first, dovetail joint means, for releasably anchoring complementary dovetail joint means of a second block edgewisely of the first-mentioned block within the plane of the second block; and

> (b) second, straight tenon and mortise joint means, for frictionally securing complementary tenon and mortise joint means of a third block edgewisely of the first-mentioned block within a

---

4. The '900 Patent is attached as Exhibit Two to the Plaintiffs' Appendix.

plane substantially orthogonal to the third block; wherein said second joint means is characterized in that it specifically allows assemblage of a number of walls each made from a plurality of said modular units, and erection of a puzzle structure having a continuous external structure circumscribing an enclosure.

*Id.* at col. 6, lines 39–60. The fourth claim ("Claim Four") of the '900 Patent defined the pieces as they exist in combination to form the three dimensional puzzle. *See id.* at col. 7, line 9 to col. 8, line 14. The second, third and fifth claims ("Claims Two, Three and Five," respectively) each were dependent upon the structure described in Claim One. *See id.* at col. 6, line 61 to col. 7, line 2; col. 7, lines 3–8; col. 8, lines 14–23.

In support of the Motion to Vacate, Telebrands stated the Invention, as described in the claims of the '900 Patent, utilizes straight tenons and mortises to connect the edges of the puzzle pieces to create corners for forming a three dimensional structure. *See* Telebrands Statement of Facts at ¶ 6. Telebrands stated every claim of the '900 patent requires the puzzle piece include a straight tenon and mortise joint. Telebrands stated the puzzle pieces described in the '900 Patent are connected "edgewisely" of each other. *See id.* at ¶ 8.

The Plaintiffs disputed the construction of the '900 Patent by Telebrands. They stated the Invention covers a "modular unit," *i.e.,* a single piece, with many different features. *See* Plaintiffs' Statement of Facts at ¶¶ 5–6. According to the Plaintiffs:

[The '900 Patent] must have both mortise and tenon and traditional puzzle dovetail connectors on the same piece. It must be intended for use in making a three dimensional, self-standing, puzzle structure with a continuous surface. The piece must also have an image on one surface that it is a part of an overall puzzle image....

Opposition Brief at 12–13. In this regard, the Plaintiffs argued:

[Telebrands'] attempt to suggest that Mr. Gallant's innovation simply lies in the particular way of joining the walls is fundamentally incorrect. Mr. Gallant's innova-

tion is more accurately described as a puzzle piece that contains both traditional puzzle dovetail features and mortise and tenon features, that, when used in combination with other similar pieces allows the construction, *for the first time,* of stable, realistic, three dimensional puzzles of buildings and other structures.

*Id.* at 13–14 (emphasis in Opposition Brief).

### 3. *The Telebrands Castle Puzzle*

As mentioned, in or about 1994, Telebrands began marketing and selling the Telebrands Castle Puzzle. Telebrands contended the vertical walls of the Telebrands Castle Puzzle are not connected edgewisely with a straight tenon and mortise joint, but instead are connected to the puzzle base by a peg and hole arrangement. *See* Telebrands Statement of Facts at ¶ 9. Telebrands described the peg and hole arrangement in the Telebrands Castle Puzzle as follows:

[H]oles are formed intermittently in the puzzle base or roof. Corresponding pegs extend downward from the bottom edges of the walls of the puzzle. The pegs are inserted into the intermittent holes to connect the upstanding walls of the puzzle to the base or roof.

The pieces forming the peg and hole construction of [the Telebrands Castle Puzzle] do not connect at their respective edges.

The pieces forming the peg and hole construction [of the Telebrands Castle Puzzle] do not form a continuous external surface because portions of the puzzle piece forming the base completely surround the peg projecting from the upstanding wall.

The peg and hole construction of [the Telebrands Puzzles] is not the equivalent of a straight tenon and mortise joint.

*Id.* at ¶¶ 10–13.

The Plaintiffs, by contrast, stated the vertical walls of the Telebrands Castel Puzzle are not connected to the puzzle base with pegs and holes, but are connected with mortise and tenon structures, equivalent, if not identical, to those described in the '900 Patent. *See* Plaintiffs' Statement of Facts at

¶ 9. The Plaintiffs stated the mortises in the base pieces of the Telebrands Castle Puzzle "are spaced regularly along the base of the wall, and are designed to receive tenons extending from the pieces that make up the base of the vertical walls." *Id.* at ¶ 10. The Plaintiffs further stated:

> The pieces forming the mortise and tenon structures on [the Telebrands Castle Puzzle] do connect at their respective edges.... The [Telebrands Castle Puzzle] uses mortise and tenon and dovetail features in order to make a continuous external surface.... The mortise and tenon structures used by [Telebrands] on their castle puzzle are the same as or the equivalent of the mortise and tenon structures defined in the claims of the ['900] [P]atent.

*Id.* at ¶¶ 11–13.

The Telebrands Castle Puzzle was discontinued in 1995.

#### 4. *The 4 March 1996 Order and Opinion*

In relevant part, the 4 March 1996 Order and Opinion granted the cross-motion of the Plaintiffs for partial summary judgment "to the extent that the ... pieces of [Telebrands Castle Puzzle], infringe Claims 1, 3, 4 and 5 of the '900 [P]atent." *See* 4 March 1996 Order and Opinion at 13. Upon review of the standard dictionary definitions of critical terms employed in the '900 Patent,[5] the court stated:

> Utilizing the standard definitions, the tenon and mortise joint means must be interpreted as a hole, groove, or slot in one piece with a straight tenon in another which can join the two frictionally.... Contrary to [Telebrands'] tendered interpretation of the [language in the '900 Patent], it is not necessary that [P]laintiffs' described pieces have at least one mortise and one tenon on the same piece. There

would be no purpose for such a construction; it is nonsensical.

*Id.* at 8.

The 4 March 1996 Order and Opinion also addressed the argument of Telebrands that the design of the Telebrands Puzzles utilizes a "tab and hole" construction which is shown in the prior art, specifically the 1935 patent of Oliver B. Andrews (the "Andrews Patent"). The court rejected the reliance of Telebrands on the Andrews Patent as limiting the scope of the '900 Patent. *See id.* at 11 n. 3. In distinguishing the complete walls and "narrow slits" described in the Andrews Patent from the "straight tenons" and modules described in the '900 Patent, the court determined "[t]he Andrews [P]atent does not, as a matter of law, disclose either the '900 [P]atent or the design utilized in the Telebrands [Castle Puzzle]." *See id.* at 10.

The court concluded:

> A literal reading of the claims and specifications of the '900 [P]atent reveals no distinction between the tenons on the vertical pieces of both [the Telebrands Castle Puzzle and the Invention], and no distinction between 3–sided and 4–sided mortises in the horizontal 'wall' or base of the puzzle to which the vertical pieces attach both 'edgewisely' and 'orthogonally.' *Nothing in the prosecution history, prior art or other evidence before the Court demonstrates otherwise.*

*Id.* at 11 (emphasis added) (footnote omitted).

#### 5. *The Innovation Center Report*

In or about March 1991, more than two years before the issuance of the '900 Patent, the Centre Canadien D'Innovation Industrielle Montreal (the "Innovation Center") prepared for Gallant a patentability report (the "Innovation Center Report") concerning the Invention. *See* Innovation Center Report at

---

5. The 4 March 1996 Order and Opinion defined the following "critical terms" referenced in the '900 Patent:

> **tenon:** a projecting member in a piece of wood or other material for insertion into a mortise to make a joint.
>
> **mortise:** a hole, groove, or slot into or through which some other part of an arrangement of parts fits or passes; specif: a usu. Rectangular cavity cut into a piece of timber or other material to receive a tenon.
>
> **orthogonal:** lying or intersecting at right angles.
>
> **edgewise:** with the edge toward or foremost: on, by, or with the edge.

4 March 1996 Order and Opinion at 7 (quoting Webster's Third New International Dictionary).

page G002391–A;[6] *see also* Telebrands Statement of Facts at ¶ 15; Plaintiffs' Statement of Facts at ¶ 15. The Innovation Center Report contained an opinion of patent agent Gaetan Prince ("Prince") that "a patent application filed in respect of the [Invention] would have very little chance of being granted." (The "Prince Patentability Opinion"). *See* Innovation Center Report at page G002391–A; *see also* Telebrands Statement of Facts at ¶ 16; Plaintiffs' Statement of Facts at ¶ 16. The Innovation Center Report also contained the conclusion of the Innovation Center that the Invention was not patentable. In this regard, the Innovation Center Report stated:

> During [a] subsequent telephone conversation, Mr. Prince clarified a number of points in his report which had been obscure. Firstly, in a reply to a question from us, he did not think that the imbricating corner system which makes the square crenelations correspond to the stories of the framework could be patented: this is a visual and aesthetic characteristic which, although ingenious, *shows no technical innovation. . . . To sum up, in its current state, the [Invention] cannot be patented at all.* [ (The "Innovation Center Patentability Opinion") ].

Innovation Center Report at page G002391–G002392 (emphasis added).

The Innovation Center Report also described a draft construction of the "Wee Waffle" toy (the "Wee Waffle Blocks") manufactured and sold by the Little Tikes Company ("Little Tikes"). The Innovation Center Report contained a letter from Marc Tison ("Tison"), a consumer product industrial designer at the Innovation Center, addressed to Prince, which made reference to the Wee Waffle Blocks (the "Wee Waffle Letter"). The Wee Waffle Letter stated, in part: *"the pieces of [the Wee Waffle Blocks] fit together in the same way as the corner pieces of [Gallant's] puzzle.* These pieces are made of rigid plastic." *See id.* at page G002416 (emphasis added); *see also id.* at G002418.

The Wee Waffle Blocks were patented in or about 1986. *See* United States Patent No. 285, 585 (the "Little Tikes Patent");[7] *see also* Telebrands Statement of Facts at ¶ 24. The "Little Tikes Publication," which described in detail the Wee Waffle Blocks, was published at least as early as March 1991. *See* Little Tikes Publication.[8] A review of the Little Tikes Publication reveals at least some of the Wee Waffle Blocks have a base with holes spaced inwardly from the edges, with upstanding walls connected to the base by pegs extending downward from the walls and inserted into the holes. *See* Little Tikes Publication; Telebrands Statement of Facts at ¶ 25.

Gallant subsequently hired a second patent agent, Pierre Lesperance ("Lesperance") to assist him in the filing of the U.S. Patent Application. *See* Telebrands Statement of Facts at ¶ 19.[9] Lesperance stated he received from Gallant a copy of the Innovation Center Report in or about July or August 1991, and recalled:

> [T]hat search report was negative. The patent agent [Prince] was of the opinion that there was no patent to be had. We discussed the matter and we . . . I felt otherwise. That's why we decided to file a patent application.

6. The Innovation Center Report is attached as Exhibit Three to the Miller Declaration.

7. The Little Tikes Patent is attached as Exhibit Six to the Miller Declaration.

8. The Little Tikes Publication is attached as Exhibit Five to the Miller Declaration.

9. Lesperance recalled first meeting with Gallant in or about July or August 1991, a month before the Canadian Patent Application was filed. *See* Transcript of Lesperance Deposition ("Lesperance Dep."), dated 16 December 1997, attached as Exhibit Six to the Plaintiffs' Appendix and as Exhibit Four to the Miller Declaration, at 7:17–20; 42:20–23. It appears Lesperance was, at that time, the employer of Martineau, the original patent agent who prepared the Canadian and U.S.Patent Applications. Lesperance reviewed the claims of the '900 Patent drafted by Martineau before the Canadian Patent Application was sent to the Canadian Patent Office. *See id.* at 8:21 to 9:11. Lesperance stated he was "not personally involved in the prosecution" of the Canadian or U.S.Patent Applications. *See id.* at 11:23–25; 17:19 to 18:8.

*See* Lesperance Dep. at 12:13–21.[10]

Neither Gallant nor Lesperance disclosed to the United States Patent and Trademark Office (the "U.S.Patent Office") the Wee Waffle Letter, the Prince Patentability Opinion or the Innovation Center Patentability Opinion. During his deposition, Lesperance stated:

Q: ... Is there any indication that [the Innovation Center Report] was submitted to the U.S Patent Office in connection with Mr. Gallant's U.S. [P]atent [A]pplication?

A: *I don't see any indication that it was submitted.*

Q: If you had received this document during the pendency of the application, would you have submitted it to the Patent Office?

A: Personally, no, no.... I don't see any relevancy of [the Innovation Center Report and the description of the Wee Waffle Blocks]. [The Wee Waffle Blocks are] for building block sides, I can see. It has nothing to do with a puzzle in the sense that we are dealing with. *This is [sic] building blocks for building ... yes, with mortise and tenons, but this is the only similarity.*

Lesperance Dep. at 58:24–61:3 (emphasis added); *see* Telebrands Statement of Facts at ¶ 20. It appears the U.S.Patent Office issued the '900 Patent to Gallant without considering the Wee Waffle Blocks, the Prince Patentability Opinion or the Innovation Center Patentability Opinion. *See* Telebrands Statement of Facts at ¶ 21.

### 6. Discovery Requests

In April 1995, Telebrands requested of the Plaintiffs "[a]ll correspondences between any of the [P]laintiffs and the Innovation Center of Montreal, and all prior art or other docu-

ments exchanged between them." ("The Prior Art Request"). *See* Plaintiffs' Statement of Facts at ¶ 22. In a letter, dated 19 September 1995, (the "19 September 1995 Letter") the Plaintiffs objected to the Prior Art Request, stating they "have already produced all examples of prior art that were known or made available to them at the time of the filing of patent applications in the United States or Canada." *See* 19 September 1995 Letter at ¶ 4.[11] The Plaintiffs further stated the Prior Art Request was beyond the scope of discovery permitted under the Federal Rules, and was overbroad in that it required the production of highly confidential reports. *See id.*

The Plaintiffs first produced to Telebrands the Innovation Center Report and the Wee Waffle Letter referencing the Wee Waffle Blocks on 10 December 1997. *See* Telebrands Statement of Facts at ¶ 23. The Plaintiffs explained their decision to withhold production of the Innovation Center Report until December 1997 as follows:

[P]laintiffs felt that [Telebrands] had intentionally and improperly refused to comply with [P]laintiffs' legitimate discovery efforts. This belief colored [P]laintiffs' willingness to cooperate with the discovery efforts of [Telebrands] .... [I]n [subsequent] consideration of what [P]laintiffs perceived to be a new approach taken by [Telebrands], [P]laintiffs agreed to forego their objection and produce the Innovation Center [Report].

Opposition Brief at 33–34.

### 7. Other Available Prior Art: The Quadraflex, the German Koch Reference and the Laureyssens Products

Telebrands contended the Little Tikes Publication constitutes prior art to the '900 Patent, which Plaintiffs knowingly concealed

---

**10.** Lesperance recalled receiving only the portion of the Innovation Center Report containing the Prince Patentability Opinion at the first meeting with Gallant in July or August 1991. *See* Lesperance Dep. at 47:22 to 48:19. Lesperance admitted he probably subsequently received the remaining documents contained in the Innovation Center Report. *See id.* at 48:20–24. Gallant stated, however, he provided a complete copy of the Innovation Center Report, including the ref-

erences to the Wee Waffle Blocks in the Wee Waffle Letter, to Lesperance at their first meeting. *See* Transcript of Gallant Deposition ("Gallant Dep."), dated 17 December 1997, attached as Exhibit Seven to the Plaintiffs' Appendix, at 149:5–14.

**11.** The 19 September 1995 Letter is attached as Exhibit Nine to the Miller Declaration.

from the U.S.Patent Office, Telebrands and the court. The Plaintiffs, in turn, maintained Telebrands was on notice of at least two other structures of prior art which were identical to the Wee Waffle Blocks referenced in the Innovation Center Report. Specifically, the Plaintiffs argued Telebrands was on notice of an Australian patent application filed on behalf of Quadraflex Plastics Ltd. (the "Quadraflex"). The Plaintiff contended the Quadraflex, like the Wee Waffle Blocks, utilizes mortise and tenon type structures along its peripheral edges and discloses base pieces with holes spaced inwardly from the edges of the construction pieces. *See* Opposition Brief at 16–17; Plaintiffs' Statement of Facts at ¶ 39.

The European Patent Office previously discovered the Quadraflex in or about October 1992, in connection with another patent application for the Invention (the "Europan Patent Application"). It appears from a letter, dated 16 June 1994, from the European Patent Office to the patent agents of Gallant, (the "16 June 1994 Letter") the European Patent Office initially rejected the European Patent Application because the Quadraflex disclosed the same "straight tenon and mortise joint" that Gallant claimed as the Invention. *See* Telebrands Statement of Fact at ¶ 40; *see also* 16 June 1994 Letter.[12] The European Patent Office observed:

> A puzzle block provided with a straight tenon and mortise joint means which specifically allows assemblage of a third similar block within a plane substantially orthogonal to a first similar block *is described in document AU–B–58751 [the Quadraflex] as providing the same advantages as in the present application* (see Fig. 6). In particular the disclosed joint means specifically 'allows' ... an assemblage such that a plurality of the modular units form orthogonal walls for a puzzle structure *having a continuous external surface circumscribing an enclosure.*

16 June 1994 Letter at 2 (emphasis added). The 16 June 1994 Letter further stated, in relevant part:

> It is still not apparent which part of the application could serve as a basis for a new, allowable claim.... The applicant should ... indicate in the letter of reply the difference vis a vis the state of the art and the significance thereof.

16 June 1994 Letter at 3.

In response to the 16 June 1994 Letter, it appears Gallant told the European Patent Office the Quadraflex was different from the tenon and mortise structure of the Invention in that it did not disclose the Invention described in the '900 Patent. *See* Telebrands Statement of Facts at ¶ 41; Plaintiffs' Statement of Facts at ¶ 41. In a letter, dated 2 November 1994, (the "2 November 1994 Letter") Gallant informed the European Patent Office the Invention required the tenons and mortises form a three dimensional structure with a continuous external surface, unlike the Quadraflex which did not form a continuous external surface because it required its pieces to have cross-shaped holes. *See* 2 November 1994 Letter;[13] Telebrands Statement of Facts at ¶ 42. Gallant stated:

> In fact, as already stated, the problem is not only to realise a three-dimensional puzzle from the modular units, but also to obtain a *continuous erected puzzle structure, without projections and/or holes* [.]
>
> . . . . . .
>
> If we examine the assemblage of figures 5 and 6 of AU–B–58751 [the Quadraflex], it is obvious that said assemblages include holes
>
> . . . .
>
> Therefore, even if it would be possible to combine AU–A–19712 and AU–B–58751 [the Quadraflex] (as assumed by the Examiner), the combination would not result in a *continuous* external surface. Said surface would be provided with holes[.]
>
> . . . . . .

---

12. The 16 June 1994 letter is attached as Exhibit Thirteen to the Miller Supplemental Declaration.

13. The 2 November 1994 Letter is attached as Exhibit 14 to the Miller Supplemental Declaration.

Consequently, we think that the present application involves an inventive step, since it allows the building of a three-dimensional structure with *continuous* external surface [sic].

2 November 1994 Letter at 2 (emphasis in original). In opposing the instant motion, however, the Plaintiffs maintained Gallant never distinguished the Quadraflex from the tenon and mortise structure employed in the Invention. *See* Plaintiffs' Statement of Facts at ¶ 41.

The Plaintiffs also contended the Wee Waffle Blocks are cumulative to the teachings of a foreign patent application, Koch DE 3314–496–A (the "German Koch Reference"). *See id.* at ¶ 30. Gallant disclosed the German Koch Reference to the U.S.Patent Office on the List of Prior Art References Cited By Applicant (the "List of Prior Art"), submitted in conjunction with his U.S.Patent Application. *See* List of Prior Art and the German Koch Reference at T001127–T001128; T001129–T001152.[14] The Plaintiffs argued the German Koch Reference discloses the use of tenons and mortises to form corners of a three dimensional structure. *See* Plaintiffs' Statement of Facts at ¶ 31. Telebrands, by contrast, argued the German Koch Reference teaches away from the use of tenons and mortises because it suggests the use of a pin to form a corner joint. *See* Telebrands Statement of Facts at ¶ 32; German Koch Reference at T1149, Figure 6.

The Plaintiffs also argued that on 15 February 1996, Telebrands was made aware of

three products sold by Dirk Laureyssens ("Laureyssens"), all of which also incorporated mortise and tenon type structures along peripheral edges (the "Laureyssens Products").

The Plaintiffs contended the Wee Waffle Blocks are equivalent, if not identical, to the Quadraflex, the German Koch Reference and the Laureyssens Products, all of which were brought to the attention of Telebrands before Judge Bissell entered partial summary judgment in favor of the Plaintiffs. *See* Plaintiffs' Statement of Facts at ¶¶ 39, 45–46; Opposition Brief at 14–24. Nevertheless, the Plaintiffs contended, Telebrands neglected to bring the Quadraflex, the Laureyssens Products[15] and the German Koch Reference to the attention of Judge Bissell. *See* Opposition Brief at 14–24.

### B. *Procedural History*

The Plaintiffs filed a three-count complaint (the "Complaint") on 28 January 1994. The first count of the Complaint alleged Telebrands falsely advertised the Telebrands Castle Puzzle, in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125(a). *See* Complaint at ¶¶ 26–35. According to the Plaintiffs, an advertisement by Telebrands (the "Advertisement") relating to the Telebrands Castle Puzzle, namely, "[t]his is the puzzle that's taking the country by storm," was false and "misle[ ]d a substantial segment of the viewing audience to believe that the Telebrands [C]astle [P]uzzle was the Wrebbit [C]astle

---

**14.** The List of Prior Art and the German Koch Reference are attached as Exhibit One to the Plaintiffs' Appendix.

**15.** It appears, however, Telebrands had previously requested from the Plaintiffs, but was denied, material relating to Laureyssens and any products sold by him or by his Canadian distributor, Joseph Klat. *See* "Plaintiffs' Response to Defendant's Request for Production," attached as Exhibit Fifteen to the Miller Supplemental Declaration, at Requests 46–49, 62. In denying they possessed information concerning the Laureyssens Products, the Plaintiffs expressly stated:

Plaintiffs have already reviewed their files and have determined that they do not contain documents referring to Dirk Laureyssens, ... or any of Dirk Laureyssens products or product literature; Joseph Klat, ... or any Joseph Klat's products or product literature.

*Id.* at Request 62.

Telebrands stated it did not have documents referencing the Laureyssens Products during the summary judgment proceedings which culminated in the 4 March 1996 Order and Opinion. *See* Telebrands Statement of Facts at ¶ 45. The Plaintiffs disputed this contention. They stated even though the deposition of Laureyssens which disclosed the Laureyssens Products was taken subsequent to the entry of the 4 March 1996 Order and Opinion, Laureyssens had provided counsel for Telebrands copies of the Laureyssens Products two weeks before the entry of the 4 March 1996 Order and Opinion. *See* Plaintiffs' Statement of Facts at ¶ 45; Transcript of Laureyssens Deposition ("Laureyssens Dep."), dated 15 March 1996, attached as Exhibit Five to Plaintiffs' Appendix, at 58:16–20; 63:6 to 64:10.

[P]uzzle." *Id.* at ¶¶ 26, 30. The Plaintiffs alleged Wrebbit lost sales as a result of the Advertisement. *See id.* at ¶ 35.

In the second count of the Complaint, the Plaintiffs alleged the Advertisement violated state regulations regarding unfair trade practices, particularly N.J.S.A. § 56:8–1 *et seq. See id.* at ¶¶ 39–40. The third count of the Complaint involved allegations of unfair competition. *See id.* at ¶ 43.

The Plaintiffs filed an amended complaint (the "First Amended Complaint") on 22 March 1994. The First Amended Complaint added a fourth count of patent infringement. Specifically, the Plaintiffs alleged: "[Telebrands] has been and still is infringing the claims of U.S.Patent Number 5,251,900 … without leave or license of plaintiffs herein and in violation of [P]laintiffs' rights." *Id.* at ¶ 50. In the First Amended Complaint, the Plaintiffs requested a permanent injunction prohibiting Telebrands from further engaging in unfair competition practices, a permanent injunction prohibiting Telebrands from further violating U.S. patent laws, $100,-000.00 in compensatory damages, treble damages, attorneys' fees and costs. *See id.* at ¶ 54(A)–(E).

Telebrands filed an answer (the "Answer") on 7 April 1994, which included a counterclaim (the "Counterclaim") and seven affirmative defenses (the "Affirmative Defenses").

The first four Affirmative Defenses disputed the falsity and materiality of the Advertisement. The fifth Affirmative Defense challenged the validity of the '900 Patent, alleging "U.S.Patent No. 5,251,900 is invalid and was improperly issued by the United States Patent and Trademark Office…." *Id.* at ¶ 59. According to Telebrands, "[t]he alleged invention was known or used by others in this country…." *Id.* at ¶ 59(a)–(h). The sixth Affirmative Defense alleged the actions of Telebrands did not infringe upon the '900 patent because "[Telebrands'] conduct does not come within the legitimate scope of the claims of the patent." *Id.* at ¶ 60(a).

The Counterclaim of Telebrands included a request for "declaratory judgment [holding] that U.S.Patent No. 5,251,900 is invalid and unenforceable and not infringed by Telebrands." *Id.* at ¶ 62.

The Plaintiffs filed a reply to the Counterclaim on 29 April 1994 (the "Reply to the Counterclaim"). In the Reply to the Counterclaim, the Plaintiffs asserted, *inter alia,* the Counterclaim failed to state a claim upon which relief could be granted, the Counterclaim was moot and the '900 patent was valid and enforceable. *See* Reply to the Counterclaim at ¶¶ 8–10.

On 3 June 1994, Telebrands moved to bifurcate the issue of liability from damages (the "Motion to Bifurcate"). In support of the Motion to Bifurcate, Telebrands president, A.J. Khubani ("Khubani") submitted a declaration (the "Khubani Declaration"), stating: "[i]t would be far more convenient and less expensive for Telebrands if a profits analysis were deferred until after liability is determined in this case." Khubani Declaration at ¶ 8. Khubani also expressed reluctance to disclose the "commercially sensitive" profit information of Telebrands. *Id.* at ¶ 9. By order, filed 13 October 1994, (the "13 October 1994 Order") the Motion to Bifurcate was denied.

On 7 October 1994, the Plaintiffs moved for leave to amend the First Amended Complaint. In an order, dated 6 January 1995, (the "6 January 1995 Order") the Plaintiffs were granted leave to file a second amended complaint (the "Second Amended Complaint") to include Telebrands Corp., Telebrands Advertising Corporation, and R.R. Donnelley as defendants. *See* 6 January 1995 Order at 2. The Plaintiffs were directed to substitute Telebrands Corp. for Telebrands Direct Response Corporation, and were denied their request to join Benoit, Canovex, Muralex and 133064 Canada, Inc. *See id.* at 2–3.

On 31 January 1995, the Plaintiffs filed the Second Amended Complaint. The Plaintiffs reasserted the claims of the First Amended Complaint and the Complaint. *See* Second Amended Complaint at ¶¶ 39–64. The Plaintiffs also added claims against Benoit and the Benoit Companies, alleging "Telebrands, Benoit, and the Benoit Companies conspired together and jointly planned and implemented a broad based television advertising cam-

paign for the sale of three-dimensional [C]astle and White House puzzles similar to those sold by Wrebbit." *Id.* at ¶ 42.

The Plaintiffs also included R.R. Donnelley in a fourth count ("Count Four") against Telebrands ("Count Four"). In Count Four, the Plaintiffs alleged "Telebrands, Benoit and the Benoit Companies, and [R.R.] Donnelley have infringed the U.S.Patent No. 5,251,900 by manufacturing and/or selling three-dimensional puzzle structures as claimed in said patent. . . ." *Id.* at ¶ 73.

The Plaintiffs added a fifth count ("Count Five") as well, against Benoit and the Benoit Companies. The Plaintiffs alleged as a result of the 1992 Agreement, "Benoit and the Benoit Companies came into possession of certain trade secrets and proprietary information belonging to Plaintiffs." *Id.* at ¶ 82. According to the Plaintiffs, Benoit and the Benoit Companies subsequently "misappropriated and converted to their own use certain trade secrets and proprietary information belonging to plaintiffs." *Id.* at ¶ 85.

In the Second Amended Complaint, the Plaintiffs requested one million dollars in compensatory damages, two million dollars in punitive damages, treble damages, costs and attorneys' fees, as well as a permanent injunction relating to all of the alleged wrongful acts asserted in the Second Amended Complaint. *See id.* at ¶ 88(A)-(E).

Telebrands and R.R. Donnelley filed separate answers on 13 March 1995 and 12 April 1995, respectively (the "Telebrands Answer" and the "R.R. Donnelley Answer"). The Telebrands Answer and the R.R. Donnelley Answer also contained counterclaims, both of which, *inter alia,* sought declaratory judgments invalidating the '900 Patent and declaring that neither R.R. Donnelley nor Telebrands had infringed the '900 patent. *See* Telebrands Answer at ¶ 14; R.R. Donnelley Answer at ¶ 15.

On 7 March 1995, the Plaintiffs filed a reply to the Telebrands Counterclaim (the "Reply to Telebrands Counterclaim"), and, on 25 April 1995, the Plaintiffs filed a reply to the R.R. Donnelley Counterclaim (the "Reply to R.R. Donnelley Counterclaim"). The Plaintiffs argued, *inter alia,* the Teleb-

rands Counterclaim and the R.R. Donnelley Counterclaim failed to state a claim upon which relief may be granted and were rendered moot by the filing of the infringement claims of the Plaintiff. *See* Reply to Telebrands Counterclaim at ¶¶ 8–10; Reply to R.R. Counterclaim at ¶¶ 8–10.

On 27 March 1995, Telebrands moved to dismiss Count Five of the Second Amended Complaint (the "Telebrands Motion to Dismiss"), on the grounds that Gallant never sought leave to file a misappropriation claim against Telebrands, and was never granted such leave, and Gallant failed to plead in Count Five all of the elements of a trade secret misappropriation claim. *See* Telebrands Brief in Support of Motion to Dismiss at 2.

By order, dated 25 April 1995 (the "25 April 1995 Order"), the Telebrands Motion to Dismiss was denied.

On 31 January 1996, Telebrands filed a motion for summary judgment on Count Four of the Second Amended Complaint (the "Telebrands Motion for Partial Summary Judgment"), arguing, *inter alia,* the Telebrands Castle and White House Puzzles do not infringe upon the '900 Patent because they employ a completely different construction than the tenon and mortise construction patented and used by the Plaintiffs. *See* Telebrands Summary Judgment Brief at 17–18.

Telebrands further argued "the tab and hole arrangement used by Telebrands in its castle and White House puzzles is in the public domain because it is disclosed in the prior art, including U.S.Patent No. 2,072,698, issued to Andrews in 1937 [the Andrews Patent]." *Id.* at 9.

The Plaintiffs filed a cross-motion for summary judgment on Count Four of the Second Amended Complaint (the "Plaintiffs' Cross-Motion for Partial Summary Judgment") on 31 January 1996, asserting, *inter alia,* the Telebrands Castle Puzzle infringed the first, second, fourth and fifth claims of the '900 patent both literally and under the doctrine of equivalents. *See* Plaintiffs' Summary Judgment Brief at 20–32, 32–33. Plaintiffs also conceded the Telebrands White House

Puzzle did not infringe any of the claims in the '900 Patent. *See id.* at 33–35.

Reply briefs were filed by Telebrands and the Plaintiffs on 31 January 1996.

As discussed, on 4 March 1996, Judge Bissell issued the 4 March 1996 Order and Opinion. The 4 March 1996 Order and Opinion granted partial summary judgment to Telebrands on Count Four of the Second Amended Complaint "in that their White House puzzle does not infringe U.S.Patent No. 5,251,-900. . . ." 4 March 1996 Order and Opinion at 13. The 4 March 1996 Order and Opinion also granted partial summary judgment to the Plaintiffs on Count Four of the Second Amended Complaint "to the extent that the pieces of defendant's puzzle (other than the White House puzzle) . . . infringe Claims 1, 3, 4 and 5 of the U.S.Patent No. 5,251,900. . . ." *Id.*

On 14 March 1996, Telebrands filed a motion for reargument (the "Motion for Reargument"). By order and accompanying opinion, dated 3 May 1996, (the "3 May 1996 Order and Opinion") Judge Bissell denied the Motion for Reargument.

On 6 October 1997, this case was reassigned from Judge Bissell to the undersigned.

*Discussion*

### A. Standard for Vacation of Partial Summary Judgment

Unlike a summary judgment, a partial summary judgment is interlocutory in nature and does not terminate the action as to any of the claims or parties. *See Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 7–8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980); *Liberty Mut. Ins. Co. v. Wetzel,* 424 U.S. 737, 742–44, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (holding that summary judgment which did not finally dispose of all claims was interlocutory); *Sussex Drug Prods. v. Kanasco, Ltd.,* 920 F.2d 1150, 1153 (3d Cir.1990) (partial summary judgment not "final" for Rule 54(b) purposes; judgment is "final" strictly where it "end[s] litigation on the merits and leaves nothing for the court to do but execute the judgment") (internal quotations omitted); *Benjamin Moore & Co. v. Talon Paints Prods., Inc.,* 917 F.Supp. 331, 337 (D.N.J.

1996), *aff'd,* 111 F.3d 125 (3d Cir.1997); *Garrett v. Firestone Tire & Rubber Co.,* No. 88–0708, 1989 WL 21778, at *2 (D.N.J. 7 Mar. 1989). Partial summary judgment, moreover, is not entitled to res judicata or collateral estoppel effect in other litigation. *See United States v. Horton,* 622 F.2d 144, 148 (5th Cir.1980); *Schering Corp. v. Schering Aktiengesellschaft,* 667 F.Supp. 175, 185 (D.N.J. 1987), *vacated on other grounds,* 709 F.Supp. 529 (D.N.J.1988).

Accordingly, a partial summary judgment order is subject to revision or vacation at any time prior to final judgment. *See* Fed.R.Civ.P. 54(b). Rule 54(b) of the Federal Rules of Civil Procedure ("Rule 54(b)") provides:

> *Judgment Upon Multiple Claims or Involving Multiple Parties.* When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, *which adjudicates fewer than all the claims* or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision *is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.*

Fed.R.Civ.P. 54(b) (emphasis added). Rule 54(b) is designed to "facilitate the entry of judgment on one or more claims, or as to one or more parties, in a multi-claim/multi-party action." *Allis–Chalmers Corp. v. Philadelphia Elec. Co.,* 521 F.2d 360, 363 (3d Cir. 1975).

Pursuant to Rule 54(b), partial summary judgment may be certified as final for purposes of interlocutory appeal. *See Wetzel,* 424 U.S. at 742–44, 96 S.Ct. 1202;

*Anthius v. Colt Indus. Operating Corp.,* 971 F.2d 999, 1003 (3d Cir.1992) (quoting *Allis–Chalmers Corp.,* 521 F.2d at 363–65); *Cemar, Inc. v. Nissan Motor Corp.,* 897 F.2d 120, 122–23 (3d Cir.1990) (citing *Curtiss–Wright Corp.,* 446 U.S. at 10, 100 S.Ct. 1460); *Beckwith Machinery Co. v. Travelers Indemnity Co.,* 815 F.2d 286, 290 (3d Cir.1987); *Waldorf v. Borough of Kenilworth,* 959 F.Supp. 675, 678–79 (D.N.J.1997); *Garrett,* 1989 WL 21778, at *2. A determination of Rule 54(b) certification must be "clearly articulated" and must be "in the interest of sound judicial administration and public policy." *Allis–Chalmers Corp.,* 521 F.2d at 363, 365; *see Cemar, Inc.,* 897 F.2d at 122; *Waldorf,* 959 F.Supp. at 679.

■■■ Absent Rule 54(b) certification, an order of partial summary judgment is subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of the parties. *See* Fed. R.Civ.P. 54(b); *United States ex rel. Haskins v. Omega Institute, Inc.,* 25 F.Supp.2d 510, 512 (D.N.J.1998) ("Pursuant to [Rule 54(b) ], courts retain jurisdiction over their interlocutory orders which are not certified for immediate appeal and may modify them at any time before trial."). The non-final nature of a judgment notwithstanding, "considerable import" is attached to the rendering of a partial summary judgment. *See Confer v. Custom Eng'g Co. Employee Health Benefit Plan,* 760 F.Supp. 75, 77 (W.D.Pa.1991) (citing *Harsco Corp. v. Zlotnicki,* 779 F.2d 906 (3d Cir.), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986)), *aff'd in part,* 952 F.2d 41 (3d Cir.1991).[16]

The 4 March 1996 Order and Opinion was not a final judgment; it adjudicated only the issue of patent infringement alleged in Count Four of the Second Amended Complaint. It did not address the issue of invalidity of the '900 Patent or any of the non-patent claims of the parties. *See* 4 March 1996 Order and Opinion. It appears, moreover, Judge Bissell did not certify the 4 March 1996 Order and Opinion as final. Accordingly, the 4 March 1996 Order and Opinion is subject to revision. *See* Fed.R.Civ.P. 54(b).

**B.** *Propriety of Vacation: The Newly Discovered, Non–Cumulative Evidence*

■■■ "[I]n the absence of newly discovered, non-cumulative evidence, the parties should not be permitted to reargue previous rulings made in the case." *Oritani S & L v. Fidelity & Deposit,* 744 F.Supp. 1311, 1314 (D.N.J.1990), *rev'd on other grounds,* 989 F.2d 635 (3d Cir.1993). Vacation of an order of partial summary judgment pursuant to Rule 54(b) is proper, however, where the parties proffer "supplemental evidence or new legal theories." *Omega Institute,* at 512 (quoting *Garrett,* 1989 WL 21778, at *2) (reconsidering partial summary judgment on the basis of additional evidence); *see United States v. Jerry,* 487 F.2d 600, 605 (3d Cir. 1973) (district court has inherent power to reconsider interlocutory orders "when it is consonant with justice to do so"); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 15 F.Supp.2d 406, 415 n. 8 (D.Del.1998) ("The discovery of new evidence that would alter an earlier ruling is a basis for revising a non-final order under Rule 54(b)."); *Walker v. Pearl S. Buck Foundation, Inc.,* No. 94–1504, 1996 WL 706714, at * 2 (E.D.Pa. Dec.3, 1996) (interlocutory order reconsidered on basis of newly discovered facts); *Hatco Corp. v. W.R. Grace & Co.,* 849 F.Supp. 987, 990 (D.N.J.1994) (new evidence permits reconsideration of previous decision).

■■■ Subsequent to the issuance of the 4 March 1996 Order and Opinion, Telebrands came into possession of the Innovation Center Report which contained, among other things, a patentability opnion of Prince and a description of the Wee Waffle Blocks prior art. *See* Innovation Center Report. It appears the Plaintiffs received the Innovation Center Report in March 1991. As discussed

---

**16.** The standard for granting a motion to vacate under Rule 54(b) is less rigid than that under Rule 60(b) of the Federal Rules of Civil Procedure ("Rule 60(b)"). *See* Fed.R.Civ.P. 60(b) Advisory Committee Notes; *Farr Man & Co. v. M/V Rozita,* 903 F.2d 871 (1st Cir.1990); *Confer,* 760 F.Supp. at 77. Relief under Rule 60(b) is limited to parties seeking revision of final judgments. *See* Fed.R.Civ.P. 60(b). A party seeking modification or vacation of an interlocutory order, however, need not meet the "stricture[s] ... of Rule 60(b)." *Farr Mann & Co.,* 903 F.2d at 875.

in greater detail below, based upon this newly discovered, non-cumulative evidence first received by Telebrands on 10 December 1997, the 4 March 1996 Order and Opinion is vacated.

### 1. The Evidence is Newly Discovered

As mentioned, the Innovation Center Report, prepared for Gallant before the issuance of the '900 Patent, contained the Prince Patentability Opinion, which stated: "a patent application filed in respect of the [Invention] would have very little chance of being granted." See Innovation Center Report at page G002391–A. The Innovation Center itself also concluded the Invention "shows no technical innovation" and "cannot be patented at all." See id. at G002391–G002392. Also highlighted in the Innovation Center Report was prior art, specifically the Wee Waffle Blocks, which "fit together in the same way as the corner pieces of [the Invention of Gallant]." See id. at G002416.

It is undisputed neither Gallant nor patent agent Lesperance disclosed to the U.S.Patent Office the Prince Patentability Opinion, the Innovation Center Patentability Opinion or the Wee Waffle Letter, before the issuance of the '900 Patent. See Telebrands Statement of Facts at ¶ 20; Plaintiffs' Statement of Facts. It is undisputed these portions of the Innovation Center Report were not before the court during the summary judgment proceedings. See 4 March 1996 Order and Opinion. It also is undisputed that, despite repeated requests by Telebrands, the Plaintiffs did not produce the Innovation Center Report to Telebrands until 10 December 1997, more than one and a half years after the entry of the 4 March 1996 Order and Opinion. See Telebrands Statement of Facts at ¶ 24; Plaintiffs' Statement of Facts.

It further appears Telebrands received information concerning the Laureyssens Products only after briefing its arguments on summary judgment before Judge Bissell. See Plaintiffs' Statement of Facts at ¶ 45. Significantly, the deposition of Laureyssens was taken subsequent to the 4 March 1996 Order and Opinion. See Laureyssens Dep. at 58:16–20; 63:6 to 64:10; Plaintiffs' Statement of Facts at ¶ 5. Even if, as the Plaintiffs contended, Laureyssens provided counsel for Telebrands copies of the Laureyssens Products two weeks before the entry of the 4 March 1996 Order and Opinion, Telebrands was effectively deprived the opportunity of developing the prior art during the summary judgment proceedings.

The Laureyssens Products and the contents of the Innovation Center Report constitute newly discovered evidence which, if previously presented to the court on summary judgment, may have influenced, if not altered, the 4 March 1996 Order and Opinion. See Procter & Gamble Co., 15 F.Supp.2d at 415 n. 8; Omega Institute, at 512.

### 2. The Evidence is Non–Cumulative of Existing Prior Art[17]

Vacation of a partial summary judgment order is warranted where the newly discovered evidence is non-cumulative of the evidence previously available. See Omega Institute, at 512; Oritani S & L, 744 F.Supp. at 1314. The Plaintiffs argued the disclosure of the Wee Waffle Blocks was unnecessary in light of the existing prior art disclosed to the U.S.Patent Office (the German Koch Reference), the court (the Andrews Patent) and to Telebrands (the Quadraflex and the Laureyssens Products). The Plaintiffs argued, moreover, the existing prior art, as well as the Wee Waffle Blocks, do not disclose the structure and design contemplated in the '900 Patent.

As mentioned, the "innovative features" of the '900 Patent are characterized by the a particular way of joining the walls of a three dimensional puzzle:

---

17. An analysis of whether the Wee Waffle Blocks are cumulative of the prior art available to Telebrands necessarily involves a cursory examination of the design and structure of the Wee Waffle Blocks, the '900 Patent and the existing prior art. The findings in this opinion, insofar as they may construe the '900 Patent and any prior art, are not factual evidentiary findings, but instead are limited in scope to the instant Motion to Vacate. As discussed, the standards for vacation under Rule 54(b) are relatively undemanding in light of newly discovered, non-cumulative evidence. As explained below, a Markman Hearing is necessary to properly construe the claims of the '900 Patent and the prior art.

[T]he innovative features lie in the corner joints ... where the straight (U-shape) mortise and tenon parts ... intervene to join two building blocks.

'900 Patent at col. 4, lines 64–67. Claim One of the '900 Patent requires the edges of a puzzle piece have a "straight tenon and mortise" joint. It appears from the '900 Patent the "U-shape" corners of the building walls are formed by aligning the edges of the two puzzle pieces and interlocking the straight tenons and mortises at those edges. *See id.* at Figure Three, numerals 28, 34, 36. Claim One additionally requires the puzzle pieces connect "edgewisely" to form walls "having a continuous external surface." *See id.* at col. 6, lines 53, 59–60; *see also id.* at Figure Three.

a. *Evidence Before the U.S.Patent Office*

(1) *The German Koch Reference*

It appears the Wee Waffle Blocks may not be cumulative of other prior art which was disclosed to the U.S.Patent Office before the issuance of the '900 Patent. The Plaintiffs argued Gallant withheld the Little Tikes Publication and Little Tikes Patent from the U.S.Patent Office, and, ultimately, the court and Telebrands, because the Wee Waffle Blocks "demonstrate[ ] the same attachment systems shown in the Koch Patent" which was disclosed to the U.S.Patent Office. *See* Opposition Brief at 3. Consequently, the Plaintiffs argued, the Wee Waffle Blocks are "cumulative" of the teachings of the German Koch Reference. *See id.* at 3–4. Significantly, the Plaintiffs withheld the data concerning the Wee Waffle Blocks in retribution for what they perceived as the failure of Telebrands to comply with their discovery demands. *See* Opposition Brief at 33–34.

For purposes of vacation, it appears the Wee Waffle Blocks may not be cumulative of the German Koch Reference, the latter of which may not disclose the use of tenons and mortises. *See* Telebrands Statement of

Facts at ¶ 31; *but see* Plaintiffs' Statement of Facts at ¶ 31.[18]

■■ The asserted unilateral determination by Gallant and his patent agents, moreover, not to disclose the Wee Waffle Blocks data on the basis that they are "cumulative" of the German Koch Reference is impermissible. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1257 (Fed.Cir.1997) (quoting *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992)) ("It is axiomatic that '[c]lose cases should be resolved by disclosure, not unilaterally by [the] applicant."), *cert. denied,* —— U.S. ——, 118 S.Ct. 1510, 140 L.Ed.2d 665 (1998); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.,* 989 F.Supp. 547, 635 (D.Del.1997). That the Plaintiffs determined the Wee Waffle Blocks to be cumulative of the German Koch Reference does not justify or excuse the withholding of information to the U.S .Patent Office, the court or Telebrands. Moreover, the willful decision not to disclose the date appears to be an attempt by the Plaintiffs to "punish" Telebrands for the approach the Plaintiffs perceived Telebrands assumed during discovery. The Plaintiffs believed Telebrands:

had intentionally and improperly refused to comply with [P]laintiffs' legitimate discovery efforts. This belief colored [P]laintiffs' willingness to cooperate with the discovery efforts of [Telebrands] .... [I]n [subsequent] consideration of what [P]laintiffs perceived to be a new approach taken by [Telebrands], [P]laintiffs agreed to forego their objection and produce the Innovation Center [Report].

Opposition Brief at 33–34. This is simply impermissible.

(2) *The Innovation Center Report*

Telebrands argued the Prince Patentability Opinion, the Innovation Center Patentability Opinion and the Wee Waffle Letter contained in the Innovation Center Report were intentionally withheld from the U.S.Patent Office. *See* Moving Brief at 2, 3–4. The

---

18. It is presently unnecessary to determine whether the German Koch Reference actually discloses the use of tenons and mortises. The mere possibility the attachment systems of the German Koch Reference and the Wee Waffle

Blocks are not identical satisfies the non-cumulative evidence requirement of Rule 54. *See Farr Man & Co.,* 903 F.2d at 875 (observing the relatively lenient standard for vacation under Rule 54); *Confer,* 760 F.Supp. at 77.

Plaintiffs, however, argued Gallant disclosed to his patent agent, Lesperance, *"relevant"* portions of the Innovation Center Report, namely the Patentability Opinions of the Innovation Center and Prince. *See* Opposition Brief at 4 (emphasis added); Lesperance Dep. at 43:14–17 (recalling he received such portions during his first meeting with Gallant in 1991). The Plaintiffs also attempted to justify their nondisclosure of the contents of the Innovation Center Report by arguing the Prince Patentability Opinion, although "not favorable," was not *"definitive."* *See* Opposition Brief at 1–3 (emphasis added); *see also* Lesperance Dep. at 12:22–13:1; 29:18–20 (disagreeing with Prince Patentability Opinion). The Plaintiffs further argued disclosure of the Innovation Center Report was unnecessary in light of the failure of the Prince Patentability Opinion and the Wee Waffle Letter to "expressly" reference the Wee Waffle Blocks. *See id.* at 3.

▮▮ These excuses are unavailing. The arguments proffered by the Plaintiffs fail to explain their nondisclosure of the *entire* Innovation Center Report, including those portions the Plaintiffs conceded were "relevant." With respect to the so-called irrelevant portions of the Innovation Center Report, that the Prince Patentability Opinion was not definitive or that Lesperance may have disagreed with it, is insufficient to excuse its nondisclosure. The very fact that the negative opinions of Prince and the Innovation Center were contained in the Innovation Center Report required their disclosure to the U.S.Patent Office.

Additionally, the Plaintiffs did not proffer an adequate explanation for why Gallant unilaterally determined the references to the Wee Waffle Blocks in the Innovation Center Report were irrelevant and undeserving of disclosure to Lesperance or the U.S.Patent Office. Significantly, the Plaintiffs did not dispute Tison was referring to the Wee Waffle Blocks in the Wee Waffle Letter. The fact that Tison did not "expressly" employ the terms "Wee Waffle Blocks" is immaterial; it is no excuse for non-disclosure.

The Plaintiffs also feebly suggested Martineau, an associate of Lesperance who drafted the claims and specifications of the '900 Patent, knew of the Wee Waffle Blocks and the Wee Waffle Letter while the U.S.Patent Application was pending. *See* Opposition Brief at 10. They argued Martineau had a reasonable basis for withholding such information from the U.S.Patent Office. *See id.* It appears, however, from a declaration of Martineau, dated 30 January 1998, (the "Martineau Declaration") Martineau never stated he received or reviewed the Little Tikes Publication while the U.S.Patent Application was pending, or, for that matter, made a reasoned decision to withhold it. *See* Martineau Declaration.[19] The possibility remains that Martineau received the Innovation Center Report after the commencement of the instant litigation, and therefore could not have made a reasoned decision to withhold it from the U.S.Patent Office before the issuance of the '900 Patent.

As discussed, as a matter of law, Gallant was neither authorized nor permitted to unilaterally resolve conflicts or confusion concerning the importance and relevance of the Patentability Opinions or the Wee Waffle Letter by withholding them from the U.S.Patent Office. Such conflicts and confusion must be resolved in favor of disclosure. *See Critikon,* 120 F.3d at 1257; *LaBounty Mfg.,* 958 F.2d at 1076.

The excuses for failing to disclose the Wee Waffle prior art to the U.S.Patent Office are, in any event, irrelevant. They do not explain or excuse the failure of the Plaintiffs to disclose the Wee Waffle prior art to the court or Telebrands, before the 4 March 1996 Order and Opinion was filed.

b. *Evidence Before the Court on Partial Summary Judgment*

It further appears the Wee Waffle Blocks are not cumulative of the evidence disclosed to the court before the issuance of the 4 March 1996 Order and Opinion. In the Telebrands Motion for Summary Judgment on Count Four of the Second Amended Complaint, Telebrands argued, "[t]he claims of the '900 [P]atent cannot be construed to cov-

---

**19.** The Martineau Declaration is attached as Exhibit Eight to the Plaintiffs' Appendix.

er [the Telebrands Castle Puzzle.]" Telebrands Summary Judgment Brief at 14. According to Telebrands, the Telebrands Castle Puzzle does not infringe upon the '900 Patent because it uses a "tab and hole" or "peg and hole" arrangement to connect the walls to the base, not interlocking mortise and tenon joints. *See id.* at 17–18. Telebrands argued pegs extend downward from the bottom edges of the vertical walls and corresponding holes are formed within the base. Telebrands explained the pegs are inserted into the holes of the Telebrands Castle Puzzle to connect the upstanding walls to the base. *See id.; see also* Telebrands Castle Puzzle Assembly Instruction Sheet.[20]

Telebrands argued the Telebrands Castle Puzzle does not have the required edge-to-edge "U-shape" or "edgewisely" connection described in the '900 Patent, but forms an "edge-to-middle" relationship or a "T-shape." Because the holes are spaced inwardly, it was argued on summary judgment, the Telebrands Castle Puzzle lacks the "continuous external surface" of the '900 Patent. Telebrands additionally argued:

> [T]he tab and hole arrangement used by Telebrands in its castle … puzzle[ ] is in the public domain because it is disclosed in the prior art, including U.S.Patent No. 2,072,698, issued to Andrews in 1937 [the Andrews Patent].

*Id.* at 9.

In the Plaintiffs' Cross–Motion for Summary Judgment, the Plaintiffs argued, *inter alia,* the claim language "edgewisely," "tenon" and "mortise" should be construed broadly to encompass a peg and hole structure. *See* Plaintiffs' Summary Judgment Brief at 13 ("The piece … will always be connected edgewisely, even if the mortise is in the middle of the base piece.").

In the 4 March 1996 Order and Opinion, Judge Bissell broadly construed the claim language, as urged by the Plaintiffs. Upon reviewing the standard dictionary definitions of the relevant terms, the court stated:

> [T]he tenon and mortise joint means must be interpreted as a hole, groove, or slot in one piece with a straight tenon in another

which can join the two frictionally.… Contrary to [Telebrands'] tendered interpretation of the language [of the '900 Patent], it is not necessary that plaintiffs' described pieces have at least one mortise and one tenon on the same piece.

4 March 1996 Order and Opinion at 8. The court concluded:

> A literal reading of the claims and specifications of the '900 [P]atent reveals no distinction between the tenons on the vertical pieces of both puzzles, and no distinction between 3–sided and 4–sided mortises in the horizontal 'wall' or base of the puzzle to which the vertical pieces attach both 'edgewisely' and 'orthogonally.' *Nothing in the prosecution history, prior art or other evidence before the Court demonstrates otherwise.*

*Id.* at 11 (emphasis added). Judge Bissell also rejected Telebrands' reliance on the Andrews Patent, concluding "[t]he Andrews [P]atent does not, as a matter of law, disclose either the '900 [P]atent or the design utilized in the Telebrands [C]astle [P]uzzle." *Id.* at 10. The court instead adopted the argument of the Plaintiffs that the Andrews Patent discloses a flat tab and a "narrow slit," while the Telebrands Castle Puzzle employs a thick peg, or tenon. *See* Plaintiffs' Summary Judgment Brief at 12; 4 March 1996 Order and Opinion at 10.

Judge Bissell, having reviewed all of the prior art disclosed to him, determined the particular structures described in the claims of the '900 Patent were not in the public domain. *See* 4 March 1996 Order and Opinion. As stated, at the time of the issuance of the 4 March 1996 Order and Opinion, Telebrands was not in possession, and indeed was not aware of, the Wee Waffle Blocks data. At that time, the Little Tikes Publication existed in the prior art. It had been published at least as early as March 1991, the date of the Innovation Center Report which contained the publication. It appears disclosure of the Wee Waffle Blocks data probably would have upset the determination that the structure contemplated in the '900 Patent was not in the public domain.

---

**20.** The Assembly Instruction Sheet is attached as Exhibit Eight to the Miller Declaration.

Significantly, it appears the Wee Waffle Blocks are not sufficiently similar in design and structure to the Andrews Patent so as to render ineffectual their nondisclosure to the court. The Little Tikes Publication reveals the Wee Waffle Blocks do not utilize the flat "tabs" and "slits" illustrated in the Andrews Patent. It appears the Wee Waffle Blocks have a base with holes spaced inwardly from the edges, into which pegs are inserted to connect upstanding walls. *See* Little Tikes Publication. It appears the Little Tikes Publication illustrates a peg and hole arrangement, the type of which the court deemed infringing.

The Plaintiffs nevertheless argued the Little Tikes Publication would not have affected findings set forth in the 4 March 1996 Order and Opinion because the court knew tenons and mortises existed in the prior art, based upon the dictionary definitions. *See* Opposition Brief at 26–27. The dictionary definitions, however, do not disclose pegs and holes for connecting a three dimensional building structure to a base. The definitions do not disclose tenons and mortises forming a three dimensional structure with a "continuous external surface circumscribing an enclosure," as the claims of the '900 Patent require. Because the dictionary definitions do not adequately describe the types of pegs and holes utilized in the Wee Waffle Blocks, an isolated review of the dictionary definitions would not, and indeed did not, demonstrate Telebrands was practicing the prior art.

#### c. *Evidence Available to Telebrands*

It further appears the Wee Waffle Blocks may not be cumulative of other prior art available to Telebrands at the time of the entry of the 4 March 1996 Order and Opinion, but which was not disclosed to the court.

#### (1) *The Quadraflex*

The Plaintiffs argued the Quadraflex, available to Telebrands before the entry of partial summary judgment, contains the same "peg and hole" disclosure as the Wee Waffle Blocks. Telebrands, by contrast, argued the Quadraflex does not show a base with holes spaced inwardly from the edges or

upstanding walls connected to the base by pegs inserted into holes. Consequently, Telebrands argued, it could not have used the Quadraflex on summary judgement to show it was practicing the prior art. Telebrands argued the Wee Waffle Blocks are more pertinent than the Quadraflex prior art, because the Wee Waffle Blocks clearly disclose the peg and hole arrangement for connecting a three dimensional puzzle to a base.

It appears the Plaintiffs' position concerning the Quadraflex in opposing the instant motion is inconsistent with the stance they assumed in November 1994. To obtain the European Patent Application, Gallant told the European Patent Office the Quadraflex was different from the tenon and mortise structure Gallant was attempting to patent. As mentioned, in the 2 November 1994 Letter, Gallant informed the European Patent Office the Invention requires the tenons and mortises form a three dimensional structure with a continuous external surface. Gallant contrasted the Invention with the Quadraflex, which, he argued, does not form a continuous external surface because it requires its pieces to have cross-shaped holes. *See* 2 November 1994 Letter; Telebrands Statement of Facts at ¶ 42. Specifically, Gallant stated:

> In fact, as already stated, the problem is not only to realise a three-dimensional puzzle from the modular units, but also to obtain a *continuous erected puzzle structure, without projections and/or holes* [.]
>
> .     .     .     .     .
>
> If we examine the assemblage of figures 5 and 6 of AU–B–58751 [the Quadraflex], it is obvious that said assemblages include holes
>
> . . . .
>
> Therefore, even if it would be possible to combine AU–A–19712 and AU–B–58751 [the Quadraflex] (as assumed by the Examiner), the combination would not result in a *continuous* external surface. Said surface would be provided with holes[.]
>
> .     .     .     .     .
>
> Consequently, we think that the present application involves an inventive step, since

it allows the building of a three-dimensional structure with *continuous* external surface [sic].

2 November 1994 Letter at 2 (emphasis in original).

■ The Plaintiffs, through their admissions to the European Patent Office, conceded the irrelevance of the Quadraflex as prior art to Telebrands. The Plaintiffs cannot now assume a contrary position. *See Tanabe Seiyaku Co. v. United States Int'l Trade Comm'n,* 109 F.3d 726, 733 (Fed.Cir. 1997) (admission made to foreign patent office bars later assumption of contrary position), cert. *denied,* —— U.S. ——, 118 S.Ct. 624, 139 L.Ed.2d 605 (1997); *Merck & Co., Inc. v. Mylan Pharmaceuticals, Inc.,* 19 F.Supp.2d 334, 344 n. 17 (E.D.Pa.1998) (statements to foreign patent office should be considered when they constitute relevant evidence); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.,* 32 F.Supp.2d 265, 290 (D.Md. 1998) (same).

Assuming, *arguendo,* the pieces of the Quadraflex are comparable to those of the Wee Waffle Blocks, this alone would not explain or excuse the unilateral decision of the Plaintiffs not to disclose the Wee Waffle Blocks data to the U.S.Patent Office, Telebrands or the court. *See Critikon,* 120 F.3d at 1257; *LaBounty Mfg.,* 958 F.2d at 1076.

### (2) The *Laureyssens Products*

■ The Plaintiffs also argued that at the time the 4 March 1996 Order and Opinion was issued, Telebrands was aware of the Laureyssens Products, all of which incorporate mortise and tenon type structures equivalent to those of the Wee Waffle Blocks.[21] Telebrands, however, contended it did not have documents referencing the Laureyssens Products during the summary judgment proceedings which culminated in the 4 March 1996 Order and Opinion. *See* Telebrands Statement of Facts at ¶ 45.

As indicated, it appears that before the entry of the 4 March 1996 Order and Opin-

ion, Telebrands specifically requested material relating to Laureyssens and any products sold by him or by Joseph Klat, his Canadian distributor. *See* Plaintiffs' Response to Defendant's Request for Production, at Requests 46–49, 62. The Plaintiffs denied possessing information concerning Laureyssens or the Laureyssens Products. *See id.* at Requests 49, 62.

Even if the Laureyssens Products were eventually disclosed to Telebrands two weeks before the *entry* of the 4 March 1996 Order and Opinion, as the Plaintiffs contended, Telebrands was deprived of an adequate opportunity to brief and sufficiently develop this prior art evidence before the court. Irrespective of the exact date on which Telebrands was alerted to the existence of the Laureyssens Products, the fact remains the Laureyssens Products were not made available to Telebrands in a timely fashion. If the Plaintiffs had initially accommodated the request of Telebrands for information concerning the Laureyssens Products, Telebrands may have used the information during partial summary judgment. The attempt of the Plaintiffs to withhold the Laureyssens Products from Telebrands during the summary judgment proceedings independently warrants vacation of the 4 March 1996 Order and Opinion, as well as sanctions.

Even if the Laureyssens Products were disclosed to Telebrands in a timely manner, the disclosure of the Laureyssens Products would not explain or justify the nondisclosure of the Wee Waffle Blocks. *See Critikon,* 120 F.3d at 1257 (quoting *LaBounty Mfg.,* 958 F.2d at 1076) (close cases must be resolved in favor of disclosure).

In light of the newly discovered, non-cumulative evidence withheld from the U.S.Patent Office, the court and Telebrands, the Motion to Vacate is granted.

### C. *Markman Hearing for Claim Construction*

Telebrands also requested a *Markman* Hearing to construe the claims of the '900

---

**21.** As mentioned, the Plaintiffs stated even though the deposition of Laureyssens which disclosed the Laureyssens Products was taken subsequent to the 4 March 1996 Order and Opinion, Laureyssens provided counsel for Telebrands copies of the Laureyssens Products two weeks before the entry of the 4 March 1996 Order and Opinion. *See* Plaintiffs' Statement of Facts at ¶ 45; Laureyssens Dep. at 58:16–20; 63:6 to 64:10.

Patent for trial. *See* Moving Brief at 12–15 (citing *Markman v. Westview Instruments Inc.,* 52 F.3d 967).

The purpose of a *Markman* Hearing is to conduct a patent infringement analysis and construe disputed claims. *See Cleanox Envtl. Services, Inc. v. Hudson Envtl. Services, Inc.,* 14 F.Supp.2d 601, 604–05 (D.N.J.), *aff'd in relevant part, Mantech Envtl. Corp. v. Hudson Envtl. Svcs., Inc.,* 152 F.3d 1368 (Fed.Cir.1998) (conducting a *Markman* Hearing to construe disputed claims); *Boehringer Ingelheim Animal Health, Inc. v. Schering–Plough Corp.,* 984 F.Supp. 239, 245 (D.N.J.1997).

A patent infringement analysis is a two-step process. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir. 1998) (in banc); *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1152 (Fed.Cir.1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *Cole v. Kimberly–Clark Corp.,* 102 F.3d 524, 528 (Fed.Cir. 1996), *cert. denied,* — U.S. ——, 118 S.Ct. 56, 139 L.Ed.2d 20 (1997); *Markman,* 52 F.3d at 976 (citing *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821 (Fed.Cir.1992)); *Cleanox,* 14 F.Supp.2d at 606; *Phillips Electronics North Am. Corp. v. Universal Electronics Inc.,* 930 F.Supp. 986, 997 (D.Del.1996).

First, the meaning and scope of the patent claims asserted to be infringed must be determined. *See Markman,* 517 U.S. at 384, 116 S.Ct. 1384; *Cybor Corp.,* 138 F.3d at 1454; *CVI/Beta Ventures,* 112 F.3d at 1152; *Cole,* 102 F.3d at 528; *Markman,* 52 F.3d at 976; *Cleanox,* 14 F.Supp.2d at 607. This step is commonly referred to as "claim construction" or "claim interpretation." *Markman,* 52 F.3d at 976; *Cleanox,* 14 F.Supp.2d at 607.

Second, the properly construed claims must be compared to the device or method that is accused of infringing. *See Cybor Corp.,* 138 F.3d at 1454; *Markman,* 52 F.3d at 976; *Cleanox,* 14 F.Supp.2d at 607.

A patent is a fully integrated document; it must set out a written description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains" to practice the invention. 35 U.S.C. § 112 ("Section 112"). "It has long been understood that a patent must describe the exact scope of an invention and its manufacture to secure to [the patentee] all to which he [or she] is entitled, [and] to apprise the public of what is still open to them." *Markman,* 517 U.S. at 373, 116 S.Ct. 1384.

The interpretation and construction of a patent claim are "exclusively within the province of the court." *Markman,* 517 U.S. at 391, 116 S.Ct. 1384; *see also Cybor Corp.,* 138 F.3d at 1454; *CVI/Beta Ventures,* 112 F.3d at 1152; *Cleanox,* 14 F.Supp.2d at 607. A court therefore has "the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman,* 52 F.3d at 979; *see also Exxon Chem. Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1556 (Fed.Cir.1995), *cert. denied,* 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996); *CVI/Beta Ventures,* 112 F.3d at 1152; *Cleanox,* 14 F.Supp.2d at 607. When performing such an analysis, various sources may be consulted, including those that are intrinsic and extrinsic to the patent claims. *See Cybor Corp.,* 138 F.3d at 1454; *CVI/Beta Ventures,* 112 F.3d at 1152; *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582–83 (Fed.Cir.1996); *Lubrizol,* 64 F.3d at 1556; *Markman,* 52 F.3d at 979–80; *Cleanox,* 14 F.Supp.2d at 607.

There is a hierarchy of evidence to be considered with the emphasis given first to the words of the claims, then to the specification of the patent, then to the prosecution history of the patent, if in evidence, and finally to extrinsic evidence. *Vitronics,* 90 F.3d at 1582; *see also Cybor Corp.,* 138 F.3d at 1454 (majority opinion) and *Cybor Corp.,* 138 F.3d at 1462 (Plager, J. concurring); *Lubrizol,* 64 F.3d at 1556; *Cleanox,* 14 F.Supp.2d at 607.[22] Despite this hierarchy, a

---

**22.** The intrinsic evidence of the public record must first be examined when construing the meaning of a patent claim. *See Vitronics,* 90 F.3d at 1582; *Cleanox,* 14 F.Supp.2d at 607.

Such evidence is "the most significant source of the legally operative meaning of disputed claim language." *Id.; see also Cleanox,* 14 F.Supp.2d at 607. Intrinsic evidence includes (1) the

court nevertheless may properly decide to hear all proffered evidence prior to construing the claims, provided it does not accord any weight to extrinsic evidence that is inconsistent with the intrinsic evidence. *Vitronics*, 90 F.3d at 1584; *see also Cybor Corp.*, 138 F.3d at 1454 (majority opinion) and *Cybor Corp.*, 138 F.3d at 1475 (Rader, J. dissenting).

█ The issue *sub judice* is the whether the newly produced Wee Waffle Blocks data necessitates a *Markman* Hearing to provide a single, consistent claim construction. In support of its request for a *Markman* Hearing, Telebrands argued: "the newly produced Little Tikes prior art creates a significant evidentiary basis for construing the '900 [P]atent claims. Therefore, the issue of claim construction should be reevaluated in view [of][sic] that evidence." Moving Brief at 12. The Plaintiffs opposed the request for a *Markman* Hearing, arguing the 4 March 1996 Order and Opinion "reflects the fact that he [Judge Bissell] has already conducted [the two-step infringement] analysis." Opposition Brief at 28.

A *Markman* Hearing is necessary in light of the newly discovered, non-cumulative prior art. It appears from the 4 March 1996 Order and Opinion the court performed the two steps of the patent infringement analysis. *See* 4 March 1996 Order and Opinion at 5–6. It appears, however, the analysis was dependent upon the prior art disclosed to the court. *See id.* As mentioned, Judge Bissell stated:

> claims of the patent, (2) the specifications of the patent and (3) the prosecution history of the patent, if in evidence. *See Cybor Corp.*, 138 F.3d at 1466–67 (Mayer, C.J.concurring); *Vitronics*, 90 F.3d at 1582; *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1580 (Fed.Cir.1995), *cert. denied*, 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996); *Markman*, 52 F.3d at 979; *Cleanox*, 14 F.Supp.2d at 607–08. In most instances, an analysis of the intrinsic evidence alone will resolve any asserted ambiguity in a disputed claim term. *Markman*, 517 U.S. at 389; *Vitronics*, 90 F.3d at 1583; *Cleanox*, 14 F.Supp.2d at 608.
>
> Extrinsic evidence is "all evidence external to the patent, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 979, 980; *see Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed.Cir.1990), *cert. dismissed*, 499 U.S. 955, 111 S.Ct. 1434, 113 L.Ed.2d 485

A literal reading of the claims and specifications of the '900 [P]atent reveals no distinction between the tenons on the vertical pieces of both [the Telebrands Castle Puzzle and the Invention], and no distinction between 3–sided and 4–sided mortises in the horizontal 'wall' or base of the puzzle to which the vertical pieces attach both 'edgewisely' and 'orthogonally.' *Nothing in the prosecution history, prior art or other evidence before the Court demonstrates otherwise.*

*Id.* at 11 (emphasis added). The court, in holding the Telebrands Castle Puzzle infringed upon the '900 Patent, was not afforded the opportunity to evaluate the Wee Waffle Blocks prior art, or, for that matter, the Laureyssens Products. The Wee Waffle Blocks data, and possibly also the Laureyssens Products data, were disclosed subsequent to the entry of the 4 March 1996 Order and Opinion. Consequently, the patent analysis set forth in the 4 March 1996 Order and Opinion was based upon an incomplete record.

█ The patent analysis undertaken by Judge Bissell will not be duplicated by conducting an independent *Markman* Hearing to construe the claims of the '900 Patent. The newly discovered prior art forecloses the possibility of duplication. Additionally, the 4 March 1996 Order and Opinion addressed only the issue of infringement. It appears the issue of invalidity of the '900 Patent was not decided. A Markman Hearing provides

> (1991). This type of evidence may be consulted during construction of a claim to assist with the understanding of "scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Markman*, 52 F.3d at 980; *see Vitronics*, 90 F.3d at 1584. In addition, extrinsic evidence may be received to aid in "coming to a correct conclusion as to the true meaning of the language employed in the patent." *Markman*, 52 F.3d at 979 (citations omitted). Moreover, if, after consideration of all available intrinsic evidence, there still is some genuine ambiguity in the claims, extrinsic evidence may be consulted to interpret the meaning of the language used in the claim. *See Vitronics*, 90 F.3d at 1584. Extrinsic evidence cannot be used, however, for the purpose of varying or contradicting the terms of the claims. *See id.*

an opportunity to construe claims consistently for purposes of both infringement and invalidity.[23] *See Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1481 (Fed. Cir.1998) (stressing "the useful general rule that trial courts should decide all litigated issues [specifically, infringement and invalidity], in the interests of finality."); *see also C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1363 (Fed.Cir.1998) ("Claims must be interpreted the same way for determining infringement as was done to sustain their invalidity"); *Kegel Co. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1429 (Fed.Cir.1997) ("[C]laims must be interpreted and given the same meaning for purposes of both validity and infringement analyses.") (internal quotations omitted); *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1583 (Fed. Cir.1991) (patent claims must be construed consistently for purposes of both infringement and invalidity).

Because a new patent analysis is necessary to provide a consistent and more thorough claim construction, the request of Telebrands for a *Markman* Hearing is granted. Accordingly, the construction of the claims of the '900 Patent is reserved pending a *Markman* Hearing.[24]

**23.** As with an infringement analysis, "the first step in any invalidity ... analysis is claim construction, [which is] ... a question of law." *See Rockwell Int'l Corp. v. United States,* 147 F.3d 1358, 1362 (Fed.Cir.1998) (citing *Cybor Corp.,* 138 F.3d at 1454); *Avia Group Int'l Inc. v. L.A. Gear,* 853 F.2d 1557, 1562 (Fed.Cir.1988). While claim construction is a matter of law for the court, the application of the construed claims to the accused device requires a factual determination performed by a jury. *See ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 539–40 (Fed.Cir. 1998); *PPG Indus. v. Guardian Indus. Corp.,* 156 F.3d 1351, 1357 (Fed.Cir.1998).

**24.** It is, at this stage, premature to determine whether extrinsic evidence, such as the Martineau Deposition, dated 14 July 1998, will be necessary to properly define the scope of the '900 Patent. *See* Telebrands 14 August 1998 Letter (requesting consideration of Martineau Deposition); Plaintiffs' 21 August 1998 Letter (opposing consideration of Martineau Deposition). As explained, in most instances, an analysis of the intrinsic evidence alone will resolve any asserted ambiguity in a disputed claim term. *Markman,* 517 U.S. at 389, 116 S.Ct. 1384; *Vitronics,* 90 F.3d at 1583; *Cleanox,* 14 F.Supp.2d at 608.

## D. *Sanctions*

Telebrands also requested sanctions against the Plaintiffs for concealing the Innovation Center Report and the Wee Waffle Blocks prior art, as well as the Laureyssens Products data. *See* Moving Brief at 15–17; Telebrands Reply Brief at 10–14. Specifically, Telebrands requested an award of attorneys' fees, pursuant to Rule 37(c) and (d) of the Federal Rules of Civil Procedure ("Rule 37"), for the summary judgment proceedings which culminated in the 4 March 1996 Order and Opinion.

Rule 37 authorizes the imposition of sanctions, including attorneys' fees, against litigants who fail to comply with discovery. *See Ins. Corp. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 763, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980); *ACF Indus., Inc. Carter Carburetor Div. v. Equal Employment Opportunity Comm'n,* 439 U.S. 1081, 1083, 99 S.Ct. 865, 59 L.Ed.2d 52 (1979); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 207, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Sieg v. Township of Tinicum,* No. 89–5236, 1992 WL 345096, at *1 (E.D.Pa.12 Nov.1992).[25]

Only upon review of the specification, claims and the prosecution history, if in evidence, undertaken pursuant to a *Markman* Hearing, can it be determined whether resort to extrinsic evidence is unnecessary.

**25.** Rule 37 provides, in relevant part:

(c) *Failure to Disclose; False or Misleading Disclosure; Refusal to Admit.* (1) A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions ... [such as] requiring payment of reasonable expenses, including attorney's fees, caused by the failure....

(d) *Failure of Party to attend at Own Deposition or Serve Answers to Interrogatories or Respond to Request for Inspection.*

If a party ... fails ... to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interroga-

■ The decision to impose sanctions and the choice of an appropriate sanction are discretionary. *See Nat'l Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *ACF Indus.,* 439 U.S. at 1085, 99 S.Ct. 865; *Newman v. GHS Osteopathic Inc.,* 60 F.3d 153, 156 (3d Cir.1995); *Curtis T. Bedwell & Sons, Inc. v. Int'l Fidelity Ins. Co.,* 843 F.2d 683, 691 (3d Cir.1988); *Mangano v. Am. Radiator & Standard Sanitary Corp.,* 438 F.2d 1187 (3d Cir.1971); *George V. Hamilton, Inc. v. Everett Co.,* 104 F.R.D. 106, 111 (W.D.Pa. 1985). A sanction must be appropriate and "specifically related to the particular 'claim,' which was at issue in the order to provide discovery." *General Ins. Co. of Am. v. Eastern Consolidated Utilities, Inc.,* 126 F.3d 215, 220 (3d Cir.1997) (quoting *Ins. Corp.,* 456 U.S. at 707, 102 S.Ct. 2099); *see Martin v. Brown,* 63 F.3d 1252, 1264 n. 15 (3d Cir. 1995) (citing *Roadway Express,* 447 U.S. at 763–64, 100 S.Ct. 2455); *Newman,* 60 F.3d at 156; *Transportes Aereos de Angola v. Ronair, Inc.,* 104 F.R.D. 482, 499 (D.Del.1985).

■ Rule 37 sanctions must be applied diligently "both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Roadway Express,* 447 U.S. at 763–64, 100 S.Ct. 2455 (quoting *National Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778); *see Dunn v. Warhol,* No. 91–4169, 1993 WL 149991, at *1 (E.D.Pa.10 May 1993).

■ Where a party has willfully withheld highly relevant and highly adverse material from discovery, despite specifically tailored and repeated requests for such material, sanctions are appropriate. *See Arthur v. Atkinson Freight Lines Corp.,* 164 F.R.D. 19 (S.D.N.Y.1995). The ultimate, untimely production of the requested material does not excuse dilatory behavior. *See George V. Hamilton, Inc.,* 104 F.R.D. at 109–10.

■ In this instance, sanctions are appropriate. It appears the Plaintiffs withheld the Innovation Center Report and the Wee Waffle Blocks prior art from discovery notwithstanding repeated requests by Telebrands. Significantly, as mentioned, in April 1995, Telebrands requested of the Plaintiffs "[a]ll correspondences between any of the [P]laintiffs and the Innovation Center of Montreal, and all prior art or other documents exchanged between them." *See* Plaintiffs' Statement of Facts at ¶ 22. In response to the Prior Art Request of Telebrands, the Plaintiffs unequivocally stated they *"have already produced all examples of prior art that were known or made available to them at the time of the filing of patent applications in the United States or Canada." See* 19 September 1995 Letter (emphasis added).

Telebrands also specifically requested material relating to Laureyssens or the Laureyssens Products before the issuance of the 4 March 1996 Opinion and Order. *See* Plaintiffs' Response to Defendant's Request for Production at Request 46–49, 62. The Plaintiffs denied possessing information concerning Laureyssens or the Laureyssens Products, stating:

> Plaintiffs have already reviewed their files and have determined that they do not contain documents referring to Dirk Laureyssens, ... or any of Dirk Laureyssens products or product literature; Joseph Klat, ... or any Joseph Klat's products or product literature.

*Id.* at Request 62; *see also id.* at 46.

It appears at the time of these requests, the Plaintiffs possessed the Innovation Center Report and information concerning the Laureyssens Products. The Plaintiffs, however, did not produce the Innovation Center Report and information concerning the Wee Waffle Blocks to Telebrands until 10 December 1997, well after the entry of the 4 March 1996 Order and Opinion. *See* Telebrands

---

tories, or ... to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court in which the action is pending on the motion may make such orders in regard to the failure as are just.... In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust. Fed.R.Civ.P. 37(c) and (d).

Statement of Facts at ¶ 23. The Plaintiffs also failed to produce information concerning the Laureyssens Products in time for Telebrands to brief and develop these materials before the entry of the 4 March 1996 Order and Opinion. Had the Plaintiffs initially accommodated the requests of Telebrands for the Innovation Center Report and information concerning the Laureyssens Products, Telebrands may have utilized such information during partial summary judgment.

 The Plaintiffs attempted to explain their decision to withhold production of the Innovation Center Report until December 1997 as follows:

> [P]laintiffs felt that [Telebrands] had intentionally and improperly refused to comply with [P]laintiffs' legitimate discovery efforts. This belief colored [P]laintiffs' willingness to cooperate with the discovery efforts of [Telebrands] .... [I]n [subsequent] consideration of what [P]laintiffs perceived to be a new approach taken by [Telebrands], [P]laintiffs agreed to forego their objection and produce the Innovation Center [Report].

Opposition Brief at 33–34. It appears from this statement the Plaintiffs intentionally withheld production of the Innovation Center Report and the Wee Waffle prior art as a punitive tactic to compel Telebrands to comply with their own discovery requests. This admission by the Plaintiffs that their objections to discovery requests were essentially groundless and designed to withhold evidence as a punishment is sanctionable in its own right.

Accordingly, the request of Telebrands for sanctions is granted. The Plaintiffs must reimburse Telebrands for attorneys' fees associated with the summary judgment proceeding culminating in the 4 March 1996 Order and Opinion.[26] Telebrands is directed to submit to Magistrate Judge Dennis M. Cavanaugh a certification and proof of attorneys' fees by the close of business 15 January 1999. The Plaintiffs may challenge the substance of the certification of Telebrands

no later than the close of business 29 January 1999.

*Conclusion*

For the reasons stated, the Motion to Vacate is granted. A *Markman* Hearing will be held to consistently construe the claims of the '900 Patent. The request of Telebrands for discovery sanctions also is granted.

---

**26.** Telebrands did not request reimbursement for the attorneys' work and time in preparing the